## POLK v. MILES, Collector of Internal Revenue.

(District Court, D. Maryland. May 10, 1920.)

No. 816.

**1. Internal revenue ☞8—Transfer of corporate stock held not made in "contemplation of death."**

A transfer of corporate stock by a father to his son, made to settle family quarrels and to assure the father an income after the death of his wife, who had been furnishing him money, is not made in "contemplation of death," within the statute imposing the inheritance tax, where the father, though advanced in years, was in vigorous health, but died unexpectedly shortly after the transfer.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Contemplation of Death.]

**2. Internal revenue ☞8—Transfer of corporate stock for interest thereon during transferor's life takes effect immediately.**

A transfer of corporate stock by a father to his son, in consideration of the son's promise to pay the father during his life a stated interest on the par value of the stock, takes effect immediately, and is not postponed till the death of the father, and is therefore not subject to the inheritance tax.

At Law. Action by Gabriel Clark Polk, individually and as executor of the estate of Lucius C. Polk, against Joshua W. Miles, Collector of Internal Revenue for the District of Maryland and Delaware. Judgment directed for plaintiff.

Fisher & Fisher, of Baltimore, Md., for plaintiff.

Samuel K. Dennis, of Baltimore, Md., for defendant.

ROSE, District Judge. The plaintiff seeks to recover an inheritance tax paid under protest. To understand the issues involved, it is necessary to go back to the conditions under which there was living, in the spring of 1915, a family consisting of Lucius C. Polk, upon whose estate the tax has since been levied, his wife, Mary E. Polk, and their son, Gabriel C. Polk. They will be referred to as the "husband," "wife," and "son," respectively.

For many years, the husband had held all the stock of the Chesapeake Brewing Company. It had been a losing venture, kept afloat by advances nominally made by the husband, but for the most part apparently out of funds given to him from time to time by his wife, who was in receipt of a large income, to which she was entitled for life, with remainder to the son. The husband had scant resources of his own. The sands of the wife's life were, to the knowledge of all of them, rapidly running out. The husband and son were on anything but goods terms. The wife and son believed that the husband would not wait long after her death before contracting a new alliance, with a person of whom they strongly disapproved. The husband also had his apprehensions that the decease of his wife would cut off his source of supply, as it was highly probable that the son would be far less liberal with him. He could not get anything from the brewery, for

it was steadily running behind. Indeed, without new money to put into it, it would speedily go into liquidation.

A new quarrel between husband and son led all of them to seek the mediation of a close relative, a distinguished Baltimore judge. As the result of his interposition, on the 11th of May, 1915, some 17 months before Congress imposed any tax on inheritances, the husband and son entered into a written agreement, the purpose and effect of which is now in controversy. By it the husband made over to the son all his stock in the brewery, and all that it owed him, amounting to a trifle less than $105,000. The son promised that during the lifetime of the wife the brewery should pay the husband monthly interest at the rate of 4 per cent. per annum on this sum, and after the death of the wife the son would, so long as the husband lived, guarantee that such payments would be made.

The government claims that the $105,000 was taxable, as transferred by the husband (1) in contemplation of, or (2) intended to take effect in possession or enjoyment at or after his death.

[1] What constitutes contemplation of death within the meaning of like statutes has been many times decided, and the facts of this case do not bring it within any well-considered definition ever given to the phrase. It is true that the husband was well advanced in years, but he was still vigorous, and was supposed to be looking forward to matrimony rather than to death. The latter overtook him rather suddenly, not long after the statute became a law.

[2] May the collector of internal revenue sustain his action, on the ground that the transfer made was not intended to take effect in possession or enjoyment until after the husband's death? There is no question that the son at once entered into possession of the brewery's stock, with whatever enjoyment it was possible to get out of it. The agreement reserved to the husband no rights in it, and the government has not sought to tax the stock, which was worthless, or nearly so. The indebtedness had value, provided the business was promptly wound up. What, if anything, it would be worth, if its collection was postponed until after the death of the husband, no one could then say. What did the transaction amount to? Was it anything other than the purchase by the husband from the son of an annuity of nearly $4,200 a year, payable in monthly installments; the buyer paying for it by assigning to the seller his claim against the brewery? It has been many times held that the vendor of an annuity enters at once into the possession and enjoyment of the price paid for it, which does not, upon the death of the annuitant, figure as part of his estate for taxation purpose. Matter of Edgerton, 35 App. Div. 125, 54 N. Y. Supp. 700, affirmed 158 N. Y. 671, 52 N. E. 1124; Matter of Thorne, 44 App. Div. 8, 60 N. Y. Supp. 419, affirmed in 162 N. Y. 238, 56 N. E. 625.

It follows that the tax was improperly collected, and the plaintiff is entitled to recover it.